316 F.2d 214
 Maurice LIBERMAN, Joseph Grevey and Jack Grevey,
co-partners, d.b.a. Duke City Lumber Company, and
Duke City Lumber Company, a partnership,
Appellants,
v.
George H. NAGEL, Appellees.
 No. 17642.
 United States Court of Appeals Ninth Circuit.
 March 23, 1963, Rehearing Denied May 15, 1963.
 
 1
 McCutchen, Doyle, Brown & Enersen, Burnham Enersen and Frederick O. Koenig, San Francisco, Cal., Jennings, Strouss, Salmon & Trask, Phoenix, Ariz., for appellants.
 
 
 2
 Moore, Romley, Killingsworth & Kaplan, Elias M. Romley, Philip A. Robbins, and James J. Cox, Jr., Phoenix, Ariz., for appellees.
 
 
 3
 Before BARNES and HAMLEY, Circuit Judges, and BOWEN, District Judge.
 
 
 4
 BOWEN, District Judge.
 
 
 5
 In this case in the Trial Court, the appellees (plaintiffs below) sued the appellants (defendants below) for breach of an alleged oral option agreement made September 20, 1958, and informally reduced to writing September 23, 1958, to sell to appellees a one-half interest in a Winslow, Arizona lumber milling business and related properties which were acquired November 6, 1958 by appellants from Arizona Timber Company, a competitor or associate of appellees and appellants, and which properties both appellees and appellants had separately prior to their making such option contract considered purchasing.
 
 
 6
 The trial was by the Court without a jury and resulted in the final judgment of July 28, 1961 for appellees for the total sum of $429,883.40 with interest thereon at 6% Per annum from date of entry of the initial judgment on June 20, 1961.
 
 
 7
 From that final judgment and from certain prior orders and the initial judgment, all inherent in the final judgment, appellants now appeal to this Court assigning as errors the following:
 
 
 8
 (1) The District Court erred in finding that the parties reached any agreement concerning the purchase and operation of the mill during their informal conversation in Winslow.
 
 
 9
 (2) The District Court erred in concluding that the parties made a valid, lawful contract granting an option when Robert Jenkins signed one of the two letter agreements drafted by Maurice Liberman.
 
 
 10
 (3) The District Court erred in awarding excessive damages.
 
 
 11
 (4) The District Court erred in failing to hold that the proper measure of damages was the difference between appellees' cost of performance and the market value of one-half the mill.
 
 
 12
 (5) The District Court erred in concluding that appellees were entitled to more than the difference between cost of performance and the market value of one-half the mill if they were awarded the profits it found they might have earned from ownership of one-half the mill.
 
 
 13
 (6) The District Court erred in awarding damages without taking into account the costs of appellees' performance.
 
 
 14
 (7) The District Court erred in awarding as special damages anticipated profits in excess of the difference between the cost of appellees' performance and the market value of one-half the mill.
 
 
 15
 (8) The District Court erred in computing the profits it awarded.
 
 
 16
 This action involves more than $10,000 exclusive of interest and costs, and is a diversity of citizenship case. The Trial Court had jurisdiction under 28 U.S.C. 1332, and this Court has jurisdiction under id. 1291.
 
 
 17
 Hereinafter, the appellants will, unless the context otehrwise indicates, be referred to when the following words or expressions are used: Liberman, Liberman group, Liberman partnership, Liberman interests, Duke City Lumber Co., Duke City.
 
 
 18
 Similarly, upon like conditions, appellees will be referred to when the following words or expressions are used: Mrs. Nagel, Nagel, Nagels, Nagel Lumber & Timber Co., Nagel mill, Nagel business.
 
 
 19
 Also, upon like conditions, when used hereinafter the words or expressions Gallagher, the Gallaghers, Gallagher mill, Gallagher-Winslow Mill, Gallagher timber, Arizona Timber Company, Gallagher Properties, Gallagher Arizona properties, Gallagher-Kaplan Mill will be deemed to refer to the identical sawmill, timber, timber contracts, business and properties which are the subject of the option agreement made September 20, and informally reduced to writing September 23, 1958, between appellees and appellants, and also to all properties acquired by appellants under the contract of November 6, 1958 with the Arizona Timber Company and the Gallagher interests.
 
 
 20
 With timber purchased from the Sitgreaves National Forest and cut into lumber in their sawmill at Winslow, Arizona, George H. and Mabel J. Nagel, his wife, did a lumbering and sales business there from November, 1942 through September 1957, under the name of Nagel Lumber & Timber Company, just owning the mill and the timber contracts. For a number of years prior to September 1958, the Nagel business operations had been dependent largely upon the timber sold to it from the Sitgreaves National Forest. For that reason the Nagel group, when the alleged option agreement was made, was well informed as to the available timber supply in that National Forest and the Winslow area.
 
 
 21
 Mr. Nagel managed the Nagel mill most of the time prior to September 29, 1951, but on that date because of his poor health Mrs. Nagel became and has since remained the manager of the Nagel Mill and business. In 1952 or 1953 George M. Brown became assistant manager and so continued until 1955 when Robert T. Jenkins, son-in-law of George H. and Mabel J. Nagel and one of the partners, became and still is the assistant manager.
 
 
 22
 Effective October 1, 1957 that business became and now is a partnership, of which George H. and his wife, Mabel J. the same family's new lumber concentration Georgia Mae Jenkins, as general partners, and Georgia Mae Jenkins, Trustee for James Henry Nagel, a minor, as a limited partner, are the partnership members doing business as Nagel Lumber & Timber Co., a limited partnership, and said partners together with that partnership are the appellees here, and all of them at all times material to this action have been and are citizens of the State of Arizona.
 
 
 23
 Maurice Liberman (partner of and spokesman for the other appellants) at age 12 left his native Poland and moved to France where he lived for 24 years. During much of that time he in France was engaged, first as an employee and later as a junior partner, in an import-export lumber business, wholesale and retail.
 
 
 24
 In 1941 on account of war conditions he left France and came to New York where for about three months he worked in a retail lumber yard. Then he came west to McNary, Arizona and there worked in the McNary family's Southwest Lumber Mills as a checker. After a short time, he moved to New Mexico, becoming assistant manager and soon manager of the same family's new lumber concetration plant at Magdalena, New Mexico. Later he leased and independently operated that plant, then and now named Transit Remanufacturing Company, a corporation, whose stockholders are now the same persons as the partners (the brothers Maurice Liberman, and Joseph and Jack Grevey) in the Duke City Lumber Company which owns other extensive lumber milling and sales business.
 
 
 25
 After establishing those operations in New Mexico, Liberman for that partnership in 1956 acquired or contracted for 62,500,000 feet of privately owned Aztec timber within the exterior boundaries of the Sitgreaves National Forest and in the vicinity of the Winslow, Arizona lumber milling area, and the next year, 1957, entered into timber pooling and milling contracts with Arizona Timber Company, which contracts yielded for Liberman a substantial amount of lumber.
 
 
 26
 In September, 1958, Liberman contacted Gallagher of the Gallaher-Kaplan Mill, known also as the Arizona Timber Company, respecting the purchase of the Gallagher properties in the Winslow, Arizona area, related to that milling operation. They negotiated for two or three days and on September 12, 1958 the written proposal of Gallagher to sell the Gallagher properties at the option of Liberman was signed by Liberman who put up a $10,000 money deposit, and Liberman thereby was granted an option to buy the Gallagher properties for $500,000 with an additional sum for the Gallagher standing timber, subject to Gallagher's then existing obligation to give Nagel the prior right of refusal to purchase the Gallagher properties which was still in effect on September 12, 1958 and was expressly so recognized by Liberman in that proposal. Such prior right grew out of an oral agreement between Gallagher and Nagel that if either Gallagher or Nagel decided to sell their respective properties, the seller would first offer to sell to the other before selling to any one else.
 
 
 27
 Six days after the aforesaid September 12th Gallagher-Liberman option was granted, Liberman on September 18th, after learning from a Gallagher spokesman that Gallagher had called off the September 12th proposal, phoned from Albuquerque, New Mexico, to Mrs. Nagel in Winslow, Arizona, and arranged a conference for September 20th with Mrs. Magel in Winslow regarding the Gallagher properties, out of which conference grew the option agreement here sued upon. By reason of his aforesaid experiences Liberman was well informed as to all matters connected with the subjects of that conference.
 
 
 28
 As of November, 1958 there were two sawmills at Winslow,-- the Nagel mill which had operated continuously since November, 1942, and the Gallagher mill which had operated since 1950, was acquired by appellants in November 1958 and is now known by their partnership name of Duke City Lumber Co., of which the partners are the brothers maurice Liberman, Joseph Grevey and Jack Grevey. Those brothers and that partnership are the appellants here all of whom at all times material were and are citizens of New Mexico.
 
 
 29
 The conference in the Nagel office at Winslow, Arizona took place on Saturday, September 20, 1958, as arranged by Liberman in his September 18, 1958 long distance phone call from Albuquerque, New Mexico to Mrs. Nagel in Winslow. Present at that conference lasting several hours were Liberman, Mrs. Nagel and Bob Jenkins. The discussions concerned the acquisition of the Winslow sawmill business and related properties of Arizona Timber Company, also called the Gallagher Winslow Mill, and the Gallagher Properties. At an early stage of the conference Mrs. Nagel mentioned the Nagels' desire to alone purchase the whole of those properties, but felt that such purchase would place too great a financial burden on the Nagel business. Then the discussions turned to Liberman's suggestion that the Nagels give up their right of first refusal to purchase those properties and that the parties purchase the Gallagher properties together on a 50-50 basis. Their negotiations then included that Liberman proposal together with the related questions of joint operation of the business and available timber supply and of whether they could get along in business together, whether Liberman would approve Jenkins as manager of the Callagher business if it were purchased by the Liberman and Nagel groups together, and whether Liberman would agree that owing to Nagel having money tied up in winter log deck, Nagel could have until April 30, 1959, until the spring thaw would permit the release of their winter log deck and of their capital tied up with it, to but into the business, should Liberman purchase it. They reached agreement upon Liberman's proposal and those questions and upon the manner in which the Nagels would notify Gallagher of the giving up of Nagels' right of first refusal.
 
 
 30
 The parties agreed that Liberman upon his return to Albuquerque would prepare a memorandum of that agreement, that appellee Jenkins would go to Albuquerque, sign the written document and then personally call upon Gallagher in Albuquerque and advise him of the Nagels' giving up their right of first refusal, and
 
 
 31
 The Trial Court found that Liberman prepared the written document dated September 23, 1958, reading as follows:
 
 
 32
 'September 23, 1958
 
 
 33
 'Mrs. George H. Nagel Nagel Lumber & Timber Company Winslow, Arizona
 
 
 34
 'Dear Mrs. Nagel:
 
 
 35
 'It is our understanding that you have a 'first refusal agreement' with Arizona Timber Company to buy out their Plant at Winslow; and, if you turn down this option it is our understanding that we are second in line to buy the Plant.
 
 
 36
 'It is now mutually agreed that in case either of us (and by this is meant, the companies controlled by the Liberman Group as one party; and the Nagel Lumber and Timber Company or any company controlled by the Nagel Family as the second party) will take-up the proposition made by Arizona Timber Company and buy out the Winslow Plant from them, then our companies will have the option to participate in that purchase on a fifty-fifty basis at the same terms as the purchaser will get from the Arizona Timber Company.
 
 
 37
 'This option remains in force until April 30, 1959, and will be automatically extended for six month periods unless cancelled by mutual consent.
 
 
 38
 'Very truly yours, 'MAURICE LIBERMAN 'Maurice Liberman 'Liberman Croup 'By: MAURICE LIBERMAN 'Nagel Family 'By: ROBERT T. JENKINS'.
 
 
 39
 It was further found by the Trial Court that, from the conversations and negotiations on September 20, 1958 and from that September 23, 1958 document, the appellees understood when that document was executed by the parties, (and the appellants knew or had good reason to know), that appellees understood from such conversations, negotiations and document that the parties 'had contracted and agreed that plaintiffs (appellees) would give up their aforesaid right of first refusal and would withdraw from further negotiations for the purchase of the Gallagher properties; that defendants (appellants) would then proceed to negotiate a purchase thereof; that in the event defendants purchased the Gallagher Properties, the plaintiff would have an option until April 30, 1959 to purchase from defendants an undivided one-half interest in said Gallagher Properties by paying to defendants one-half of the purchase price paid or agreed to be paid by defendants to the Gallagher Companies, payable in the manner provided for in defendants' agreement of purchase; that in the event plaintiffs exercised their said option the plaintiffs and defendants in addition to operating the business would share equally the obligation to provide any capital necessary therefor, as well as share equally the profits and losses of the business; and that defendants' privately owned Aztec timber would be manufactured by plaintiffs and defendants in the newly acquired mill, under the terms and at the prices specified in the milling agreement (between defendants and the Gallagher interests) received in evidence as Exhibit 5.'
 
 
 40
 The Trial Court further found that when the document dated September 23, 1958 was executed 'by plaintiffs (appellees) and defendants (appellants) the business enterprise herein referred to as the Gallagher Properties was a going business earning and capable of earning substantial profits, which plaintiffs and defendants contemplated said business would continue to earn in the future'; and that 'On September 23, 1958, plaintiffs released the Gallagher Companies from their first refusal agreement and withdrew from further negotiations with the Gallagher Companies for the purchase of the Gallagher Properties'.
 
 
 41
 Included also in the Trial Court's findings were the following facts: That after protracted negotiations between Maurice Liberman and the owners of the Gallagher Properties an agreement for sale of those properties was reached about 2:00 A.M. October 16, 1958, subject to final approval by both buyers and sellers at 11:00 A.M., same date; that thereafter on the same date in the early morning Mrs. Nagel received at Winslow a phone call from Liberman in New York requesting appellees to release appellants from the option agreement between them and to telegraph such release to him as soon as possible, but that Mrs. Nagel then told Liberman she did not think she would grant such release but would check with appellee Jenkins which she did; that at 8:29 A.M., same date, she wired Liberman Stating 'Do not wish to release options at this time'; that in a later phone call on same date, Liberman told Mrs. Nagel the sale price of the plant and timber but not that the sale was upon credit rather than cash; that he acknowledged receipt of her wire and asked her to come to New York which she told him she could not do; and that appellees did not again see or hear from appellants until mid-November, 1958.
 
 
 42
 The Trial Court further found that 'On October 17, 1958 a tentative draft of the purchase and sale agreement between the Gallagher Companies and appellants' was signed, and 'On November 6, 1958, defendants and the Gallagher Companies' executed a written contract of purchase and sale whereby appellants acquired the ownership of the Gallagher Properties; that in mid-November 1958, appellee Jenkins tried to arrange with Liberman for discussion of appellants' purchase of the Gallagher Properties; but the latter suggested he would contact Jenkins in Winslow soon which Liberman on account of his illness did not do.
 
 
 43
 The Court found that appellees asked on December 23, 1958 to see the November 6th sale and purchase contract for their use in deciding whether to exercise their option, but that request was refused by appellants; that '16. On January 6, 1959, plaintiffs (appellees) for the first time learned the terms of defendants' (appellants') aforesaid purchase, and on that day they advised defendants they elected to exercise their option to purchase said undivided one-half interest in the Gallagher Properties and offered to pay one-half of the purchase price. At the time of so electing the agreement of September 20, 1958 between plaintiffs and defendants was still in full force and effect, the defendants had not been released from their obligations thereunder, and plaintiffs had done all things required of them by said agreement. Also, at the time of so electing, the plaintiffs were ready, able and willing to consummate the purchase of said one-half interest'; and that '17. Defendants refused and ever since have refused to allow plaintiffs to exercise such option and acquire said undivided one-half interest.'
 
 
 44
 From the foregoing findings, the Trial Court concluded that '2. Plaintiffs (appellees) and defendants (appellants) entered into a valid, lawful contract whereby the plaintiffs were granted an option until April 30, 1959 to purchase from defendants an undivided one-half interest in the Gallagher Properties in the event of their acquisition by the defendants'; that '3. Plaintiffs fully performed their part of said agreement and on January 6, 1959 elected to purchase from defendants said undivided one-half interest in accordance with the aforesaid agreement'; and '4. Defendants breached the aforesaid agreement between plaintiffs and defendants by refusing to allow plaintiffs to exercise their aforesaid option'; that '5. Plaintiffs are entitled to recover from defendants, and each of them, as damages for breach of said contract, the present value of one-half of the net profits reasonably certain to have been derived from the operation of the Gallagher Properties by plaintiffs and defendants' in the sum of $429,883.40 wih 6% Interest thereon per annum from June 30, 1961, the date of the initial judgment, for which principla sum and interest final judgment was entered July 28, 1961.
 
 
 45
 The Court determined that if the parties had carried on pursuant to their agreement, the Gallagher Properties would have operated for 15 years during the years 1959 to 1973, inclusive, at a joint profit to the parties of $3.00 per 1000 board feet as to Duke City Aztec timber and of $4.71 per 1000 board feet as to Gallagher Aztec and Forest Service timber; that there would have been a net lumber recovery to the parties of 71,880,000 board feet from the Duke City Aztec from which the parties together would have at $3.00 per 1000 board feet made a profit of $215,640.00, of which appellees' one-half share would have been $107,820.00; and that like operations would have as to Gallagher Aztec and Forest Service timber yielded to the parties a net lumber recovery of 194,685,000 board feet, from which the parties could reasonably anticipate a profit of $4.71 per 1000 board feet, totalling a profit to the parties together of $916,966.35 of which appellees' one-half share would have been $458,483.18. Thus the Court found the aggregate sum of appellees' anticipated $107,820.00 profits share respecting the Duke City Aztec timber and of their $458,483.18 anticipated profits share respecting the Gallagher Aztec and Forest Service timber to be $566,303.18, having at the rate of 4% The present value of $478,863.40. And since the Court found that appellees would have had to pay on the purchase price interest in the total sum of $48,750.00 that sum was by the Court deducted from the total present value of appellees' one-half share of future profits, leaving the final sum of $429,883.40 as the total principal sum of damages awarded to appellees against appellants.
 
 
 46
 As to the $3.00 per 1000 board feet anticipated unit profit respecting the Duke City Aztec timber, the Court used that unit figure because 'that, under the testimony, had been agreed upon between the parties for what they would be paid for milling this particular lumber'.
 
 
 47
 Respecting the anticipated unit profit and related computations as to the Gallagher Aztec and Forest Service timber, the Court explained:
 
 
 48
 'As to the $4.71 per 1000 board feet on the Gallagher Aztec and Forest Service timber, the Court felt that the comparable operation of the Nagels during the years 1952-59 was a sound basis for estimating probable future profits of the joint operations of plaintiffs and defendants, had the contract not been breached. However, the Court determined that the plaintiffs' claimed figure for profit before depreciation, that is, $1,591,791.40 (Plaintiffs' Exhibit No. 10), was too high and made the following deductions: (a) Deducted interest paid by Nagels in the 1952-59 period in the sum of approximately $72,000.00; (b) While some management expenses had been deducted in reaching the $1,591,791.40 figure, it was estimated that the management expenses of plaintiffs' and defendants' operations would be probably $5,000.00 per year higher and, accordingly, $40,000.00 should be deducted to make Nagle experience more nearly comparable; (e) The joint operation of plaintiffs and defendants would require working capital with the resulting interest cost thereon, and defendants' estimate of $500,00.00 (obviously mistake, should be $500,000.00) at a 6% Rate would require and additional deduction of $240,000.00 for the 8-year period covered in Plaintiffs' Exhibit No. 10.
 
 
 49
 'The total of the deductions mentioned above, $352,000.00, taken from the $1,591,791.40 left $1,239,791.40; and when this was divided by the Net Sales FBM of 140,956,000, the operating profit before depreciation was $8.80 per 1000 board feet.
 
 
 50
 'The Court found that the depreciation figure of $874,928.00 arrived at in Plaintiffs' Exhibit No. 11 was sound, but since plaintiffs in Exhibit 11 spread this depreciation over a projected production of 266,565,000 feet, while the court found the total projected production to be only 245,348,000 feet, the Court could not accept plaintiffs' figure of $3.28 per 1000 board feet. Spreading the depreciation of $874,928,000.00 over a production of 245,348,000 feet resulted in a figure of $3.57 per 1,000 board feet.
 
 
 51
 'Deducting from the anticipated profit before depreciation of $8.80 per 1000 board feet, the depreciation of $3.57 per 1000 board feet left a probable net profit of $5.23 per 1000 board feet. However, since the calculation being made was of future profits and there is always uncertainty and chance in the future, the court determined to reduce the probable figure by 10% Or 52c. The result was a finding of a profit to plaintiffs and defendants, had the contract not been breached, of $4.71 per 1,000 board feet on the Gallagher Aztec and Forest Service timber.'
 
 
 52
 Although in some respects the testimony is sharply contradictory, the findings of fact are supported by ample and substantial evidence. This is true not only with regard to the making of the contract and its intended scope and meaning, but also as to its continued existence during the period in question; appellees' release, on the strength of the option contract, of the Gallagher commitment to them; appellees' refusal to release appellants from the option contract between appellees and appellants; the timely and sufficient exercise, by appellees, of their option under that option contract; appellants' failure to honer such exercise of the option; and all facts and reasonable forecasts taken into consideration by the trial court in fixing damages, including those having to do with the future supply of timber.
 
 
 53
 As before indicated the option agreement here sued upon was made at the September 20, 1958 conference at the Nagel mill office in Winslow. It was evidenced by a writing signed on behalf of the parties in the Liberman office in Albuquerque on September 23, 1958. That written form of it, however, was so abbreviated that, although it was legal in framework, much evidence was required and received to clear up what both sides and the Court realized were critical ambiguities and to explain the contract's full and true meaning.
 
 
 54
 The writing of September 23, 1958 was signed by representatives of all the parties; it expressed valied consideration and benefit moving from and to the optioners and from and to the optionees; the definite and valied time period during which the option could be exercised was from its date until April 30, 1959, with thereafter an indefinite and invalid option time extension which is of no moment here because the optionees, the appellees, completely performed or offered in good faith to perform all their obligations under the option contract before April 30, 1959.
 
 
 55
 The case was carefully tried by able trial lawyers on both sides who after sufficient time following the trial filed briefs and finally submitted the case for decision. It obviously appears from the informal findings, the very detailed explanations made by the Court to counsel after post trial motions and the 'Schedule Showing Computation by Court of Damages Sustained by Plaintiffs', that all the proceedings, pre-trial and trial, were very understandingly and skillfully conducted.
 
 
 56
 No case better than this demonstrates the wisdom of taking pre-trial depositions of important witnesses. Such depositions here undoubtedly furnished the basis for testing the accuracy and credibility of more than one of the witnesses. The Court observed the witnesses on the stand and heard their testimony. We cannot say that any finding of the Trial Court was clearly erroneous, and giving due regard 'to the opportunity of the trial court to judge of the credibility of the witnesses,' we affirm the ruling of the Trial Court that the option contract was valid and was improperly breached by appellants, and we reject appellants' error assignments (1) and (2).
 
 
 57
 In so ruling we are not unmindful of appellants' contention that at most the contract was an embryo agreement with many necessary provisions not clearly expressed, and that the contract embracing more terms than those expressed was whatever its nature void under the Statute of Frauds. Arizona Rev.Stat. 44-101(6). But we think that there is in this instrument a sufficient express statement of essential terms to withstand this challenge. The terms which are not expressly stated, such as those relating to the day-to-day management of timber and sawmill operations, are, by the reasonable intendment of the contracting parties, such as will comport with the usual methods of operations normally employed in the local timbering and sawmill industry and are well known to the parties.
 
 
 58
 As to the applicability of the Staute of Frauds, supra, and if it may be argued that the option contract arose above oral statement, the rule is that where one party to a contract has acted to his detriment, as did appellees in giving up their right of first refusal, solely in reliance upon what is contended to be an oral agreement, an estoppel may be raised to defeat the defense of the fraud statute. Waugh v. Lennard, 69 Ariz. 214, 211 P.2d 806.
 
 
 59
 The option contract was valid, appellants were not released from it and it was in effect when appellees exercised their option.
 
 
 60
 The Gallagher business, no less than the mill and the timber, was an integral part of the properties to be purchased, and the position of that milling business in the forest with its prospective future timber availability was an integral part of the Gallagher Properties, for the integrated whole of which both appellees and appellants had negotiated before and at the time of making the September 20 option agreement, and for which integrated whold the appellants negotiated when the November 6, 1958 purchase and sale contract was in the making.
 
 
 61
 Appellants object to the failure of the Trial Court expressly to rule upon their contention that appellees' failure to sign the additional letter agreement prepared by Liberman on September 24, 1958, produced a situation where the appellees must be held to have accepted only part of appellants' over-all offer. This letter purports to give appellees an option to buy the Gallagher properties from appellants seven years after appellants buy that property, assuming appellants do buy it.
 
 
 62
 It would have been helpful if there had been specific findings of fact and conclusions of law dealing with this matter. But the other findings and conclusions sufficiently reveal that the Trial Court believed that appellees already had that option by reason of the September 20 oral agreement and the September 23 letter. So viewed, the September 24 letter was a desirable but unnecessary statement of how appellants construed the previous agreement, with nothing to be gained or lost by having appellees sign the same.
 
 
 63
 Appellants contend the facts of this case fall within the rule of Joseph v. Donover Company, 9 Cir., 261 F.2d 812, but we think not, because as to familiarity with the subject matter of the contract the parties had been dealing for years with similar subjects in the same area in question here.
 
 
 64
 In determining its award to appellees for their damages, and after finding that the contract sued upon was an option to purchase an undivided one-half interest in a going business whose future profits were within the parties' contemplation and were a direct immediate inducement to the contract, the Trial Court, applying the rule of Martin v. La Fon, 55 Ariz. 196, 100 P.2d 182, gave judgment to appellees in the sum of $429,883.40 with interest, for the present value of one-half of the anticipated profits of the business for the 15-year period from 1959 through 1973, which the Court held was a reasonable period in view of the operational capacity of the business in question and in view of the other evidence relating to the available future timber supply for the Duke City mill in particular.
 
 
 65
 From the evidence as to future available timber and the explanations by the Court as to how the unit profit figures of $3.00 per 1000 board feet for the Duke City Aztec timber and $4.71 per 1000 board feet for the Gallagher Aztec and Forest Service timber were ascertained, it can readily be seen that the Court's determination of unit profit figures, future available timber and length of time during which lost future profits may reasonably be recovered, although involving some uncertainty, was not the result of mere guess work, but was supported by credible testimony and just accounting principles establishing a sound basis for the Court's action.
 
 
 66
 In the La Fon case, supra, the Arizona Supreme Court held:
 
 
 67
 '* * * The real subject of the option was a going hotel and restaurant business, which had been operated by defendant for about a year and a half, and previously had been operated by plaintiff for some two years. The physical property covered by the lease was practically useless except for the purpose of running the business. It is apparent to us the record shows the parties must have known the only reason why plaintiff desired the assignment of the lease was so he could continue the operation of that particular business on that particular site, for the purpose of making a profit by its operation, and considered that as the inducement for the option. On this state of the record, we think the trial court erred in striking from the complaint the allegations of special damages by a loss of future profits. * * *'
 
 
 68
 We think that the above stated rule of the La Fon case is the correct rule applicable to this case, and that the Trial Court correctly applied that rule here.
 
 
 69
 The Court's method of computing the damages is set out in the explainations made by the Court, but, more briefly stated, it was determined from credible evidence of experts that lumber produced by the Duke City mill will have a profitable market through 1973, that during that period sufficient timber will be available to yield a net lumber recovery of 266,565,000 board feet, or which 71,880,000 board feet of Duke City Aztec would have made a profit of $3.00 per 1000 board feet and 194,685,000 board feet of Gallagher Aztec and Forest Service timber would have made a rpofit of $4.71 per 1000 board feet, that part of those profits would have been realized each year of the period, and that, after deducting from the present value of Nagels' one-half of those future profits the present value of the interest Nagel would have had to pay on the purchase price if permitted to purchase the optioned undivided one-half interest, Nagels' net damages for loss of one-half the future profits is as above stated $429,883.40. As to such future profits experts may testify. McCormick on Damages, page 109, 29; Connecticut Ry. & Lighting Co. v. Palmer, 109 F.2d 568 (aff. 311 U.S. 544, 61 S.Ct. 379, 85 L.Ed. 336), ruling at page 571 that:
 
 
 70
 'In cases where recovery of prospective damages on breach of contract is demanded, the plaintiff is not called on to prove to a dead certainty that he will suffer a loss from the defendant's wrong. Reasonable expectations of loss is all that can generally be proved. Williston on Contracts (Rev.Ed.), section 1346.'
 
 
 71
 We think in all things related to the determination of appellees' damages, including the kind, amount and method of determination, the Trial Court committed no error and that all of appellants' assigned errors in that conncetion are not well taken and they are rejected.
 
 
 72
 The judgment of the Trial Court is in all respects affirmed.